# Sheriff *against* Neal.

The commissioners of the county having obtained a judgment against a delinquent collector and his surety, caused their lands to be levied on and sold by the sheriff, whereupon the commissioners became the highest bidders, though for a price much less than the amount of their judgment. They did not have the sale perfected by getting a deed of conveyance from the sheriff; but let it lie over for eleven years, telling the debtors that they might redeem their lands, by paying the amount of the judgment; when J. S. agreed with the debtors, to buy the lands from the commissioners for them, and to pay off the judgment; the commissioners requiring nothing more of the debtors. The commissioners accordingly, being informed of the arrangement, and told by J. S. that he was acting on behalf of the debtors, agreed to have the sale of the sheriff perfected, and to assign the title to J. S., who expressed a desire to have it done in that form, that he might hold it as a security for being repaid the money he was about to pay upon the lands for the owners thereof; it being worth at the time, more than double the amount of the judgment. *Held*, that J. S. having, by his agreement with the owners of the lands, prevented them from resorting to other means for the redemption thereof, became a trustee, by taking the assignment to himself, for the former owners of the land; and was not entitled to recover the lands in ejectment, after being tendered the amount of the money paid by him, with interest thereon, and a reasonable compensation for his trouble in discharging the trust.

ERROR to the common pleas of *Mercer* county.

Action of ejectment brought by Adam Sheriff against Alexander Neal, to recover the possession of twelve acres of land. Though twelve acres were all the land embraced in this suit, yet the question of title, was involved to four hundred acres, of which the twelve formed a part.

The plaintiff, in order to sustain his claim, gave evidence of a settlement made on the four hundred acres by James Neal, in 1797; he also gave in evidence, the record of a judgment obtained in the court of common pleas of Mercer county, of December term 1807, by the commissioners of that county, against John Neal and James Neal, for a debt of 294 dollars 56 cents, entered the 29th of February 1808; a *fiere facias* issued thereon, returnable to March term 1808, with the return of the sheriff thereto, showing a seizure and condemnation of eight hundred acres of land, including the four hundred acres mentioned above, to sale; and a writ of *venditioni exponas* sued out to May term 1818, by virtue whereof, the sheriff, according to his return made thereto, sold the lands to the commissioners, the plaintiffs in the judgment, for the sum of twenty-three dollars; also, a deed of conveyance from the then sheriff of the county, made April 23d 1829, by leave of the court, to the commissioners, perfecting the sale previously made to them in 1818; a deed of conveyance again from the commissioners, dated April 27th, 1829, to James Sheriff, for the eight hundred acres purchased at the sheriff's sale, in consideration of 543 dollars therein expressed; and then closed his evidence in chief, by producing and reading a

deed of conveyance from James Sheriff to him, the plaintiff, for two hundred acres, including the land in controversy.

On behalf of the defendant, in order to repel the claim of the plaintiff to the land, evidence was given of the declarations and admissions of James Sheriff, showing that he bought the land of the commissioners for the Neals; that he was afraid of other persons as he said, interfering and taking it from them. That the Neals were to pay him the purchase money with interest, and something for his trouble. That James Sheriff had been applied to, to sell part of the land, and refused, saying that he had bought it for the Neals. Also, that he thought there was not much probability of the Neals' redeeming the land, and he thought to make it safe for them. That when he applied to the commissioners to purchase the land, he said he was going to buy it for the Neals. That the commissioners told the Neals before they conveyed to James Sheriff, that if they could pay the judgment, the land would be given up to them; and that it was the practice of the commissioners, in such cases, to permit the owners of the lands to redeem, and to give them a preference for this purpose; that when they told the Neals they might redeem, they, the commissioners, would not have sold the land to any other. That the reason, as one of the commissioners testified, of their selling the land to James Sheriff, for the bare amount of the judgment, with the interest due thereon, was, because he said he was buying for the Neals. That the commissioners when they came to close the sale with James Sheriff, who then requested the deed of conveyance to be made to himself in his own name, objected, as they had understood from him, that he was buying for the Neals; but he replied, "he had got nothing from the Neals, and would hold the deed in security." Evidence was also given, showing that the Neals remained in the possession of the land, after the purchase thereof by James Sheriff, from the commissioners as before. That after 1828, they continued to improve the land, by building an additional dwelling house thereon, worth about 300 dollars, and by clearing and fencing about forty acres of the land, the doing of which, was worth from six to eight dollars per acre. That the land was worth, about the time James Sheriff bought, from eight to nine dollars per acre, and at the time of trial was worth twenty. That James Sheriff did not pay off the debt owing to the commissioners until 1832; and that in September 1835, before the commencement of this action, the Neals were provided with 1800 dollars, and offered to repay him all the money, with its interest, that he had paid for and on account of the land, besides a reasonable compensation for his trouble, requesting of him at the time to make out his bill, that they might know the amount; but he refused, saying, he had nothing to do with the land. Then the same offer was made to the plaintiff, but he also refused to take the money, saying he had nothing to do with it. The defendant also brought 1800 dollars into court on the

trial of the cause, which was there tendered to the plaintiff, but refused again.

Evidence was likewise given of the plaintiff's declarations and admissions, showing that he knew before he bought any part of the land, that James Sheriff had redeemed it from the commissioners for the Neals. He said it was so, but they had never paid any thing for it, and never would if let alone, and he would let them know what he was going to do. He also said, that James Sheriff was to defend, and if he (the plaintiff) did not recover, it would not be his loss.

There was some rebutting testimony given by the plaintiff, but it is only necessary to state the evidence, so far as to show, that the fact submitted by the court to the jury, which is the only error complained of and insisted on here, was not without evidence to justify it in doing so.

Breden, (president) after recapitulating the evidence to the jury, charged as follows, to wit:

" Are the jury satisfied from the evidence that James Sheriff represented to the commissioners, that he wanted to purchase the land for John and Alexander Neal, and did he, in consequence of this, and the rule adopted by the commissioners, to give to the persons, as whose property the land was sold and purchased by the commissioners, the refusal of it, and selling to such persons for the amount due the county, get the commissioners to sell to him for less than they otherwise would have sold the land for; if you are, then James Sheriff held the land purchased by him, in trust for John and Alexander Neal, and if they, or either of them, within a reasonable time repaid, or offered to repay the money, paid by James Sheriff together with interest, and a reasonable and full compensation for his trouble and expense relative thereto."

The plaintiff's counsel submitted five points to the court below, for their direction on them to the jury; but as the error insisted on related only to the third, it is, therefore, sufficient to state it with the answer of the court.

Plaintiff's third point. " If the jury believe that an express agreement was entered into, between James Sheriff and defendant, to hold the same in trust for him, such an agreement would be within the prohibitory clause of the statute of frauds, unless James Sheriff, in consequence thereof, purchased the land for a much less sum than he otherwise could have done."

Answer to the plaintiff's third point. If the jury believe that an express agreement was entered into, between James Sheriff and defendant, to hold the same in trust for him, such an agreement would be within the prohibitory clause of the statute of frauds, unless James Sheriff, in consequence thereof, purchased the land for a much less sum than he otherwise could have done. If the testimony of the witnesses is believed, as to the value of the land, at the time of purchase from the commissioners, and the testimony

of Somerville, a former commissioner, and testimony of Montgomery, a commissioner, at the time of purchasing and executing the deed to James Sheriff, is also believed, he purchased the land for a much less sum than the commissioners would have sold it for to any persons but the former owners or person purchasing for them; and, indeed, almost nothing, when compared with the value put on the land by the plaintiff's witnesses.

*Holstein*, for plaintiff in error, alleged that the court below erred, in submitting as a fact, to be determined by the jury, whether James Sheriff purchased the land from the commissioners for a less price, than he otherwise could have done, by representing to them, that he was buying it for the Neals. _ This he contended was error, because there was no evidence given whatever, tending to prove the affirmative of the fact; to support his argument, he cited Kessler *v.* Kessler, 2 *Watts* 323; 5 *Watts* 389.

*Pearson*, for defendant in error, cited 1 *Rawle* 408; 1 *Vern.* 227; 1 *Fonb. Eq.* 116; 8 *Serg. & Rawle* 492; 4 *Serg. & Rawle* 539–40; *Ibid.* 570; 5 *Watts* 512.

The opinion of the Court was delivered by

KENNEDY, J.—Admitting the evidence given on the part of the defendant below, who is also the defendant here, to be true, it would appear that the land in question, had been taken in execution and sold as the property of John and James Neal, under whom the defendant, Alexander Neal, claims, upon a judgment against them, at the suit of the commissioners of Mercer county, wherein the land lies; and a sum sufficient to cover the amount of the judgment, not being bid at the sheriff's sale, the land was purchased in by the commissioners, for a much less sum, in order to secure and make the amount thereof, if possible, by a resale of the land. The sale by the sheriff was made, in 1818, but no deed in consummation of it was asked for, or executed, until 1829, after, as it would seem, the commissioners had made a verbal agreement to sell and convey the land to James Sheriff, the immediate vendor of the plaintiff. James Sheriff, when he made the agreement for the purchase, as well as when he obtained the deed of conveyance for the land, from the commissioners, said he was buying it for John and Alexander Neal, but as he was paying for it with his own money, he must have the deed made to himself, which he would hold as a security for his money, the Neals not being able then to pay the same. The Neals were informed, after the sale of the land by the sheriff, by the commissioners then in office, that if they could pay the judgment, the commissioners would release the land to them; and John Somerville, who was one of the commissioners at that time, testifies, that they would not have sold it then, to any other person than the Neals. Charles Montgomery, one of the board of

VI.—3 s

[Sheriff v. Neal.]

commissioners, who sold the land to James Sheriff, also testifies, that the reason of their selling it to him, was, because he said he was buying it for the Neals, and that the commissioners had been in the practice of giving a preference to the former owners of the land, that they might redeem if they could.    It also appears, from the evidence, that James Sheriff, at the solicitation of one of the Neals, bought the land of the commissioners, lest the latter might sell it to some stranger; and as it is alleged, by declaring that he was buying for the Neals, he obtained it for a less price, than otherwise he could have done; which may, the more reasonably, be inferred, as it was further testified to by some of the witnesses, that the land about the time James Sheriff bought of the commissioners was worth eight dollars per acre.    The court below seem to have thought, that if James Sheriff did in this manner obtain a conveyance of the land to himself, from the commissioners for a less sum of money than they would have given it to him for, had he declared that he was buying it for himself; or not have said that he was buying it for the Neals, he thereby became a trustee in the purchase for the Neals, and to this effect accordingly instructed the jury.    The principle of law, contained in this instruction, is not complained of by the counsel for the plaintiff in error; but it is contended by him, that there was no evidence given on the trial of the cause, which justified the court in leaving it, as a matter of fact to be found by the jury, that James Sheriff had gotten the land for less consideration in money, than he would have done, had he not declared at the time, to the commissioners, that he was purchasing it for the Neals.

Now, although it is not usual in this court, to notice any rule or principle laid down as law, by the court below, and to pass upon it as being either correct or incorrect, unless it be assigned for error; and more especially, as was the case here, where it would seem to have been admitted to be correct, by the counsel for the plaintiff in error, in the court below: For, in his third point, submitted to the court, for their instruction to the jury, he requested the court to say, " that if the jury believed that an express agreement was entered into, between James Sheriff and the defendant, by which said Sheriff was to purchase said land for the defendant, and hold the same in trust for him, such an agreement was within the prohibitory clause of the statute of frauds, *unless* there was evidence to satisfy them, that said Sheriff, in consequence thereof, purchased said land for a *less price than otherwise he could have done;*" yet seeing this principle is a very important one, and to affirm it, apparently as an abstract principle might possibly be carrying the doctrine of trust further than would comport with the provisions of the act against frauds and perjuries, we do not wish to be understood as doing so, by our judgment in this case.    If any trust has arisen in favour of the Neals, out of the purchase of the land, by Sheriff, of the commissioners, it is clear, that it was not declared or created by any writing made to that

[Sheriff v. Neal.]

effect, and, therefore, cannot be considered as taken out of the act
of frauds on that ground. And as to trusts created by operation
of law, which are not embraced within the provisions of the statute,
Lord Hardwicke, in speaking of them, in Lloyd *v.* Spillet, 2 *Atk.*
150, lays it down, that, " where an estate is purchased in the name
of one person, but the money or consideration is given by another; or
secondly, where a trust is declared only as to part, and nothing
said as to the rest, what remains undisposed results to the heir-at-
law, and they cannot be said to be trustees for the residue." And
then he superadds, " I do not know in any other instance, besides
these two, where this court have declared resulting trusts by opera-
tion of law, unless in *cases* of *fraud*, and where *transactions* have
been carried on *mala fide*." As to the second instance, here men-
tioned by Lord Hardwicke, it is evident, that this case does not
fall within the principle of it; nor can it be said, that any trust
arose in favour of the Neals, upon the ground mentioned in the
first; because they paid or advanced no money in making the pur-
chase of the commissioners; nor was their money used in any way
for that purpose. The purchase was made by Sheriff, of the com-
missioners, with his own money, consequently, so far as the law
operated to raise a use from this circumstance, it was in favour of
Sheriff alone. Nor would the operation of law have been different,
even had Sheriff made a previous verbal agreement with the Neals
to purchase land for them, unless they had advanced the money to
him for that purpose; a subsequent tender of it, after the pur-
chase had been completed, would not have availed or have taken
the case out of the statute of frauds. For, unless the trust in such
case, arise at the time of making the conveyance, it cannot be
created subsequently, except by some new agreement or concur-
rent act of the parties. The strong ground, then, if not the only
one, upon which, it would seem, a trust can be raised in favour of
the Neals, is that of fraud and a breach of good faith on the part
of Sheriff, in refusing to accept of the redemption money and at-
tempting to take the land from them contrary to his agreement,
upon the faith of which they gave up to him, their right to redeem
it from commissioners. Lord Hardwicke, in alluding to trusts aris-
ing from *fraud*, has not furnished any particular case, as an exam-
ple, where a trust would be raised by construction of law, on ac-
count of the fraud practised in the transaction; it may, therefore,
not be improper to refer to some of the cases on this subject and
see how far they have gone, and are applicable to the present.

It does not appear, that the mere circumstance of the vendee's
getting a better pennyworth in the purchase of the land, by his de-
claring to the vendor, that he wished to buy for one, whom the
vendor was willing to favour, when in truth, he was employed to
purchase for another, has ever even been held a sufficient reason
for refusing to decree a specific performance; and certainly never
for setting the contract aside after it had been fully executed, or for
decreeing the vendee a trustee for the person for whom he said

he was buying the land. In Phillips *v.* The Duke of Bucks, 1 *Vern.* 227, it is said, that the lordkeeper, upon a bill for a decree of a specific performance of articles of agreement made between A and B, for the purchase of B's estate, refused the decree and dismissed the bill, because A, at the time of the agreement, pretended, that he was buying for one, whom B was desirous to oblige, when in fact, he bought for another, and by that means got the estate at an under value. But Mr Raithby has shown in a note to his edition of *Vern. Rep. p.* 229, *vol.* 1, by giving a copy of the decree taken from the register's book, that Mr. Vernon is in error; and that instead of the bill being dismissed, a specific performance was actually decreed; so that that case cannot be relied on even as an authority, for refusing to decree a specific performance, much less for setting the contract aside. Nor am I aware that the concealment of the name of the person for whom the purchase is designed, has ever been held a sufficient cause of itself, for refusing to make a decree of specific performance, much less for setting the contract aside. Lord Thurlow, in Irnham *v.* Child, 1 *Bro. Cha. Ca.* 95, says, " I should be very sorry to lay it down, that a man treating with a third person, in trust for a second, whom he had refused to deal with, could, therefore, set it aside. No case has gone so far." The case of Eyre *v.* Popham, as reported in *Lofft* 786, would seem, to be sure, to show that a specific performance was refused on that ground; and it has occasionally been noticed as going that length. See Davis *v.* Symonds, 1 *Cox* 407. But this was not the real, or at least, not the only ground upon which the bill for a specific performance was dismissed in that case. For in note (*a*) to the case of Irnham *v.* Child, in Mr Eden's edition of *Bro. Cha. Ca., vol.* 1, *p.* 95, it is said, there was *no sufficient agreement in writing,* nor proof of *part performance,* so as to take the case out of the statute of frauds.

But equity will not permit one to hold a benefit, which he has derived through the fraud even of another, and much less will it do so, if he has acquired it by means of his own fraud. This principle seems, not only to be just, and to commend itself strongly to the moral sense from the bare statement of it, but it has been acted upon, and made the foundation of a series of decisions. In Lutterel *v.* Olmius, cited 11 *Ves.* 638–9; S. C. by the name of Lutterel *v.* Lord Waltham, 14 *Ves.* 290, and reported, 1 *Cox Ca.* 414, by the name of Dixon *v.* Olmius, Lord Waltham being tenant in tail, intended to suffer a common recovery, and by will to give certain interests to his wife; Mr Lutterel, by marriage, having an interest to prevent barring the entail, did, by force and management, prevent the testator from signing the deed to make the tenant to the præcipe; Lord Thurlow's opinion was clear, that though at law Mrs Lutterel was tenant in tail, and, which makes it stronger, she was no party to the transaction; yet, neither she, nor any one else could have the benefit of that fraud; and the jury, upon an issue directed, having found, that the recovery was fraudulently prevented, Lord

Thurlow, held, even in favour of a volunteer, that a tenant in tail should not take advantage of the iniquitous act: and the estate was considered exactly, as if the recovery had been suffered.   So if a son, who is heir, prevents his father from making a will with a view to provide for younger children, by promising the father, that he will fulfil his wishes in that respect, equity will compel the son to make the provision intended by his father.   Devenish *v.* Baines, *Pre. in Cha.* 3.   Or where a father having made his will, and appointed his wife executrix, the son prevailed on his mother to get the father to make a new will, and to name him executor, he promising to be a trustee for his mother; the trust was decreed, notwithstanding the statute of frauds.   Thynn *v.* Thynn, 1 *Vern.* 296; Harris *v.* Horwell, *Gilb. Eq. Rep.* 11.   Also, where a father having made his will, and his son and heir executor, to whom he devised his lands for life, &c.; and having also bequeathed 2000 pounds amongst his daughters, talked of altering his will, through a fear there would not be assets enough to pay the legacies, when the son, in consideration that he would not alter it, promised the testator to pay the legacies: and decreed, that the son should pay the daughters their legacies in full with interest.   And the Lord Chancellor, said, it was the constant course of the court to make such decrees upon promises made, that the testator would not alter his will. Chamberlaine *v.* Chamberlaine, 2 *Freem.* 34; Oldham *v.* Litchfield, 2 *Vern.* 506.   And accordingly, where the executor having promised his testator to pay the plaintiff 100 pounds legacy, and said the testator need not put it in his will, was decreed to pay it. Reech *v.* Kennegate, *Amb.* 67; S. C. 1 *Ves.* 123.   And a court of chancery, in order to come at the truth and justice of such cases, will compel the person charged with making such promise, to discover on oath, whether he did or not.   Strictland *v.* Aldridge, 9 *Ves.* 519.   And as Lord Eldon there says, " If a father devises to his youngest son, who promises, that if the estate is devised to him, he will pay 10,000 pounds to his eldest son, this court will compel the former to discover, whether that passed in parol; and if he acknowledge it, even *praying the benefit of the statute,* he would be a *trustee* to the value of the 10,000 pounds; and then, why upon a similar principle should not a trust be raised as to the *whole value of the estate,* the promise extending to the whole?" This principle was established fully by this court, in Hoge *v.* Hoge, 1 *Watts* 163.   So if an agent be employed to purchase an estate, and purchases it for himself, he will be considered in equity as a *trustee* for his principal, and compelled to convey the right so purchased to the latter.   Lees *v.* Nuttall, 1 *Russell & Mylne* 53; S. C. 4 *Cond. Eng. Cha. Rep.* 320; so in Brown *v.* Dysinger, 1 *Rawle* 408, a purchaser of land at sheriff's sale, who completed the purchase in his own name, and with his own money, but at the time of the sale declared he was buying it for the terre-tenant, not the defendant in the execution, was held to be a trustee for the terre-

tenant.  Likewise in Stewart *v.* Brown, 2 *Serg. & Rawle* 461, prior to the last case, this court held, that a verbal agreement, between the parties, who had a joint claim to the land under a prior sale made thereof under an execution, that the defendant should purchase it again at a second sale, about to be made by the sheriff for taxes, was sufficient to make the defendant, after buying it in his own name, and paying for it with his own money, a trustee as to a moiety thereof, for the plaintiff.

Now the case before us, according to the evidence given on the trial, seems not only to come fully within the principle of the preceding cases, but to have some additional circumstances attending it, giving the defendant a much stronger claim in equity to the land in question, than in those cases referred to above.  The plaintiff's vendor here, by undertaking *to purchase,* as it has been said, but more properly speaking, to *redeem* the land from the county commissioners, for the Neals, who still in fact, claimed to be the owners of it, by paying the debt owing to the commissioners by the Neals, may truly be said to have prevented the Neals from making any exertion to raise the money otherwise for this purpose.  Though the commissioners had caused the land to be taken in execution as the property of the Neals, and to be sold by the sheriff, when they became the highest bidders, yet they never had obtained a deed of conveyance of the sheriff consummating the sale, but let it lie over, under an assurance given to the Neals, that they might redeem the land, by paying the debt, without mention of any time for that purpose; this would seem to have been the state of things, when James Sheriff, without any urgency on the part of the commissioners for the money, proposed to the Neals to advance it, and to take a deed of conveyance from the commissioners of the county, in his own name, as a *security* for the payment of the money by the Neals; so that the real transaction, upon which the deed of conveyance to James Sheriff from the commissioners was founded, would appear to have been, as much like a loan of money as any thing else to the Neals, and the deed taken merely as a *security* for the repayment of it by them; thus bringing the case pretty much within the principle of Kunkle *v.* Wolfersberger, *ante* 123. That the transaction was viewed and considered in this light by the parties, is evidenced very strongly, by the circumstance of the Neals remaining in the possession and enjoyment of the land afterwards, as before; and continuing to improve it by building houses thereon, of considerable value, as if it were their own.  It seems almost impossible, from the evidence, to account rationally for the conduct of the parties towards each, in this respect, upon any other principle: and seeing these improvements have been made by the Neals in this way, it would be a great aggravation of the fraud to take them away as well as the land.  The acquiescence of J. Sheriff, after he obtained the deed of conveyance from the commissioners, in the subsequent enjoyment and improvement of the land by the Neals,

[Sheriff v. Neal.]

in the same manner, as if it had been their own, is also powerful, if not conclusive evidence, to show he held in trust for them, and that he was to convey the land to them, as soon as they repaid him his money. Besides, his permitting the Neals to retain the possession and enjoy the land, is not only evidence of the trust, but may be considered as an execution of it, as was said by Lord Chancellor Cowper in Harris *v.* Horwell, *Gilb. Eq. Rep.* 11.

We, therefore, think that there was not only abundant evidence, given on the trial of the cause in the court below, to warrant the court in submitting it to the jury, as a question of fact, to be decided by them, whether J. Sheriff had not obtained a deed of conveyance for the land, from the commissioners of the county, for less money than otherwise he could have done, if he had not told them he was buying it for the Neals, but that the evidence went to show, very clearly, that Sheriff had taken the deed of conveyance in trust for the Neals, after being repaid the money with interest advanced by him for it; that he had induced the Neals to permit him, for the purpose of accommodating them, as he professed, to advance the money and take the deed in his own name merely as a *security:* and having thus prevented them from resorting to other means, to raise the money to redeem the land, when it became necessary, it would be against every principle of equity and good conscience, to permit him, or his vendee, knowing the circumstances, to profit by it. It would, in short, be encouraging fraud, instead of preventing it, as the statute intended.

Judgment affirmed.